# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID FITZGERALD** | : | **CIVIL ACTION** |
| *Plaintiff, pro se* | : | |
| | : | **NO. 21-5355** |
| **v.** | : | |
| | : | |
| **NATIONAL RAILROAD PASSENGER** | : | |
| **CORPORATION (AMTRAK)** | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                                 JUNE 27, 2023

## MEMORANDUM OPINION

**INTRODUCTION**

Plaintiff David Fitzgerald ("Plaintiff") brought this civil action against his former employer, Defendant National Railroad Passenger Corporation ("Defendant" or "Amtrak"), alleging that his employment with Amtrak was terminated as a result of race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* [ECF 19]. Presently, before this Court is Amtrak's motion for summary judgment, filed pursuant to Federal Rule of Civil Procedure ("Rule") 56. [ECF 53]. Plaintiff opposes the motion. [ECF 54].[1] The issues presented in the motion are fully briefed, and, therefore, this matter is ripe for disposition. For the reasons set forth herein, Amtrak's motion for summary judgment is granted, and judgment is entered in favor of Amtrak on all of Plaintiff's claims.

**BACKGROUND**

When ruling on a motion for summary judgment, a court must consider all record evidence and supported relevant facts in the light most favorable to the non-movant—here, Plaintiff. *See*

---

[1]     This Court has also considered Plaintiff's supplemental exhibits, [ECF 55], Defendant's reply, [ECF 58], and Plaintiff's sur-reply, [ECF 59].

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011). The facts relevant to the underlying motion are summarized as follows:[2]

      Plaintiff, who is African American, began working at Amtrak in April 2009 as a Building and Bridges ("B&B") Mechanic. In this role, and throughout his employment, Plaintiff was a member of the Brotherhood of Maintenance Way Employees ("BMWE"). In October of 2009, Plaintiff was qualified as a B&B Foreman and then as a B&B Inspector. From October of 2009 until the end of his employment, Plaintiff alternated between the Foreman and Inspector roles. At the time of his termination in March 2021, Plaintiff was working as an Inspector. As a B&B Inspector, Plaintiff worked with private contractors to ensure that they followed Amtrak's safety and work policies.

      When he began his employment with Amtrak, Plaintiff received a copy of Amtrak's *Standards of Excellence*. Plaintiff signed an Acknowledgement, indicating that he received and reviewed the Standards of Excellence. During his employment, Plaintiff also had access to the Amtrak Intranet, where the Amtrak's policies are available to employees. Pursuant to Amtrak's Standards of Excellence, Amtrak employees are prohibited, *inter alia*, from asking for or soliciting any type of tip or gratuity from a customer or vendor.

      In 2014, Amtrak's Ethical Conduct and Conflicts of Interest Policy required employees to avoid any possible conflict of interest and/or an appearance of a conflict of interest. The Ethical Conduct and Conflicts of Interest Policy prohibited Amtrak employees from receiving gifts, including cash or services greater than $50 in value, or favors from anyone affected by the employee's decisions. A failure to comply with the Ethical Conduct and Conflicts of Interest Policy could result in disciplinary action, including, immediate termination of employment.

      In 2018, Amtrak updated its Ethical Conduct and Conflict of Interest Policy and renamed it the "Conflicts of Interest Policy". Like the previous version of the policy, the Conflicts of Interest Policy requires Amtrak employees to avoid any possible conflict of interest or an appearance of a conflict of interest. The Conflicts of Interest Policy prohibits Amtrak employees from receiving gifts, including cash or services greater than $50 in value or $200 in aggregate value, from a person or entity that does or is seeking to do business with Amtrak. A failure to comply with the Conflicts of Interest Policy could result in disciplinary or other action, including immediate termination of employment.

      Amtrak's Code of Ethics and Standards for Behavior (the "Code") was enacted in October 2020. The Code combines Amtrak's Standards of Excellence and Code of Ethics and Business Conduct. Like Amtrak's Standards of Excellence,

---

[2] These facts are taken from the parties' briefs, exhibits, and statements of facts. To the extent that any facts are disputed, such disputes will be noted and, if material, construed in Plaintiff's favor pursuant to Rule 56.

the Code provides that Amtrak employees must never ask for or solicit any type of tip or gratuity from a customer or vendor.

Plaintiff disputes having had access to Amtrak's various policies or having had the various policies explained to him.

In 2016, Mark 1 Restoration Company ("Mark 1") was awarded a contract to repair and restore the façade of 30th Street Station in Philadelphia, Pennsylvania (the "30th Street Façade Project"). The 30th Street Façade Project was underway from approximately 2016 to 2019. Ajith Bhaskaran was the Amtrak Project Manager assigned to the 30th Street Façade Project, and Plaintiff was an Inspector. Mr. Bhaskaran was Plaintiff's supervisor. The Mark 1 Project Manager assigned to the 30th Street Façade Project was Thomas McLaughlin.

After receiving an anonymous letter in March of 2018 that included multiple allegations of wrongdoing by Mr. Bhaskaran, Amtrak's Office of Inspector General ("OIG") opened an investigation concerning potential unethical and criminal behavior by Mr. Bhaskaran. The investigation was led by OIG Special Agent James Harper. During the OIG investigation, it was discovered that the Lead Industrial Hygienist on the project, Timothy Froehlig, and Plaintiff potentially engaged in conduct violating Amtrak policies in their interactions with a Mark 1 contractor. Plaintiff became a potential subject of investigation when his name appeared on a Mark 1 expense report next to some items of value. As a result, the OIG began a separate investigation pertaining to Mr. Froehlig and Plaintiff.

As part of the investigation, Plaintiff was interviewed in November 2019 by OIG Special Agent Eugene Simms and an unnamed FBI agent. During his interview with Agent Simms, Plaintiff disclosed that in 2016, during the 30th Street Façade Project, Mr. McLaughlin (the Mark I contractor) purchased a furnace for a church where Plaintiff was the pastor. Plaintiff was interviewed a second time by OIG Agent Harper and another unnamed agent on December 3, 2020. Prior to beginning the interview, Plaintiff signed a document stating that he understood that he was being asked to provide information as part of an OIG investigation into alleged misconduct and/or improper performance of his official duties.

During the interview, Plaintiff disclosed to OIG Agent Harper that in 2016, Mr. McLaughlin handed Plaintiff his personal credit card to purchase a furnace valued at approximately $900 for a church where Plaintiff served as pastor. Plaintiff does not dispute that he accepted Mr. McLaughlin's personal credit card and used it to purchase a furnace valued at $900 to install in his church. During the interview, Plaintiff also disclosed that in the Fall of 2018, he went shopping with Mr. McLaughlin and Mr. Bhaskaran, one of whom bought Plaintiff a suit and shoes valued at approximately $420. Plaintiff told OIG Agent Harper that he believed Mr. Bhaskaran bought him the suit and shoes, but admitted that he was not present at the time the suit and shoes were purchased because he walked away and took a phone call. During the investigation, the OIG obtained an expense report that

showed that Mr. McLaughlin purchased the suit and shoes, valued at $420.16, for Plaintiff. On January 5, 2021, the OIG issued its investigative report, finding that Plaintiff's actions violated Amtrak's Code of Ethics and Standards of Behavior, as well as Amtrak's Conflict of Interest Policy.

On January 4, 2021, Plaintiff was removed from service ─ Plaintiff was not working pending the results of the disciplinary hearing. On January 11, 2021, Plaintiff was charged in writing with the following:

> On January 5, 2021, Engineering Management was made aware of an OIG Investigation involving B&B Inspector David Fitzgerald. Mark 1 Restoration Company (Mark 1) based out of 30th St. Station, Philadelphia, PA, was awarded a $58,000,000 contract to repair and restore the façade of 30th St. Station. In his role as the B&B Inspector, Mr. Fitzgerald was the Amtrak employee responsible for daily safety related issues and concerns, as they related to this project, and he worked closely with Mark 1 contractors at 30th Street Station. Mr. Fitzgerald violated Amtrak polices when he dishonestly accepted gifts and favors from these contractors; thereby taking advantage of his business relationship with Mark 1, to personally benefit himself.

Plaintiff was advised that if found culpable, he would be assessed a finding of "TERMINATION OF EMPLOYMENT IN ALL CAPACITIES."

Under the governing collective bargaining agreement (the "CBA") between BMWE and Amtrak, BMWE members that engage in misconduct are formally charged by a Charging Officer and afforded an investigatory hearing before they can be disciplined or terminated. During the hearing, both the Charging Officer and the employee (represented by a union representative) are permitted to present witnesses and/or documents to a neutral Hearing Officer. The Hearing Officer decides whether the charge has been proven and prepares a written decision. If the charge is proven, the decision is sent to the appropriate member of Amtrak management to make a decision on what discipline to apply.

On March 19, 2021, pursuant to the CBA, Plaintiff appeared for a hearing before Hearing Officer Michael J. O'Connell. During the hearing, Plaintiff was represented by his BMWE representative. OIG Agent Harper testified regarding the OIG's interviews with Plaintiff, and that Plaintiff revealed that he accepted a furnace for his church (valued at $900), a suit, and a pair of shoes. OIG Agent Harper produced Mr. McLaughlin's expense report reflecting the following expense: "David Fitzgerald, clothes/shoes: under cost, $420.16," as well as photographs of Plaintiff wearing the suit in question at various Amtrak events. Barry Bond (a Capital Construction Manager) read into the record relevant portions of Amtrak policies, including Amtrak's Standards of Excellence. On March 29, 2021, Mr. O'Connell issued his decision, finding that "based on the totality of the

overwhelming and compelling evidence before" him, the charges against Plaintiff had been proven. In the decision letter, Mr. O'Connell emphasized that Amtrak produced Mr. McLaughlin's expense report reflecting that he purchased the shoes and suit in question for Plaintiff, and that Plaintiff admitted that he accepted Mr. McLaughlin's personal credit card to purchase the furnace for his church. After reviewing the disciplinary hearing transcript and decision letter, Assistant Vice President of Engineering & Design, Raymond Verrelle, made the determination to terminate Plaintiff's employment. Plaintiff was informed of the termination decision on March 30, 2021.

As part of the same OIG investigation, administrative charges were also brought against Mr. Froehlig, who is Caucasian, for accepting gifts and favors from and taking advantage of his business relationship with Mark 1, for his personal benefit. Specifically, the OIG determined that Mr. Froehlig had accepted gifts from Mark 1, including trips to Philadelphia, and lap dances and drinks at a club. Effective February 1, 2021, Amtrak terminated Mr. Froehlig's employment for violating Amtrak's Standards of Excellence and Conflict of Interest Policy.

**LEGAL STANDARD**

Rule 56 governs summary judgment motion practice. Fed. R. Civ. P. 56. Specifically, this Rule provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When evaluating a motion under Rule 56, the court must view the evidence in the light most favorable to the nonmoving party. *Galena*, 638 F.3d at 196.

Pursuant to Rule 56, the movant bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that the movant "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be met by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* at

322. After the movant has met its initial burden, summary judgment is appropriate if the nonmoving party fails to rebut the movant's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A)–(B). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party may not rely on "bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), or rest on the allegations in the pleadings, *Celotex*, 477 U.S. at 324. Rather, the nonmoving party must "go beyond the pleadings" and, either by affidavits, depositions, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.*

**DISCUSSION**

Plaintiff asserts that Amtrak violated Title VII when it terminated his employment because of his race and in retaliation for his complaints about race discrimination. Amtrak moves for summary judgment on all of Plaintiff's claims, primarily arguing that Plaintiff has not presented evidence sufficient to meet his burden with respect to the *prima facie* elements of his claims or evidence sufficient to show that Amtrak's non-discriminatory reasons for the termination were a pretext for racial discrimination.

*Plaintiff's Disparate Treatment Claim*

As noted, Plaintiff asserts that Amtrak violated Title VII when it terminated his employment because of his race. Title VII prohibits employers from discriminating against

6

employees based on, *inter alia*, the employee's race. *See* 42 U.S.C. §2002e-2(a).[3] At the summary judgment stage, claims under Title VII are generally analyzed under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), unless the plaintiff presents direct evidence of the discrimination. *See Fakete v. Aetna, Inc.*, 308 F.3d 335, 337 (3d Cir. 2002). Here, Plaintiff does not point to any direct evidence of discrimination. Therefore, this Court must determine whether Plaintiff can support his claim under the *McDonnell Douglas* burden-shifting analysis. *See Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).

Under the *McDonnell Douglas* framework, a plaintiff must first make a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *Burton*, 707 F.3d at 426. Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant satisfies this step, the burden shifts back to the plaintiff to prove that the legitimate reason(s) offered by the defendant is merely a pretext for discrimination. *Fuentes v. Perskie*, 32 F.3d 759, 804–05 (3d Cir. 1994).

### 1. *Prima Facie Case*

To establish a *prima facie* case of race discrimination, Plaintiff must produce evidence to show that: (1) he is a member of a protected class; (2) he is qualified for the job; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of discrimination or that similarly situated persons who are not members of a plaintiff's protected class were treated more favorably. *Burton*, 707 F.3d at 426. Amtrak argues only that Plaintiff has failed to satisfy the fourth *prima facie* element.

---

[3] Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a).

To support an inference of discrimination, a plaintiff generally must present comparator evidence or "evidence that [the employer] treated 'similarly situated' individuals not within plaintiff's protected class more favorably than it treated plaintiff." *See Darby v. Temple Univ.*, 216 F. Supp. 3d 535, 542 (E.D. Pa. 2016) (quoting *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881 (3d Cir. 2011)). In the absence of comparator evidence, the plaintiff may present "evidence of similar [race] discrimination of other employees, or direct evidence of discrimination from statements or actions by [his] supervisors suggesting [racial] animus." *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010). When using comparator evidence, "[t]he plaintiff has the burden of demonstrating that similarly situated persons were treated differently." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998). For a person to be "similarly situated," the person must be similar in "all relevant respects." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009). In assessing similarity, relevant factors include "the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct . . . ." *Wilcher*, 441 F. App'x at 882. The nature of the instances of misconduct must be of "comparable seriousness." *Opsatnik*, 335 F. App'x at 223 (internal citations omitted).

To meet his burden with respect to the fourth *prima facie* element, Plaintiff proffers what he contends is comparator evidence showing that similarly situated persons outside of his protected class were treated more favorably. Specifically, Plaintiff points to four Caucasian employees who were treated more favorably despite comparable conduct — Christopher Romano, Barry Bond, Thomas Chinski, and John Cirfini. In its motion, Amtrak argues that none of these three employees is sufficiently similar to be deemed a comparator. Each of Plaintiff's alleged comparators is considered below.

### a. *Mr. Romano and Mr. Bond*

Plaintiff contends that both he and Mr. Romano, a B&B Inspector, were given apparel with Amtrak decals and winter coats with Amtrak logos, valued at approximately $900 by Mark 1 contractors, and that Mr. Bond, a Capital Construction Manager, also received a winter coat with an Amtrak decal from a Mark 1 contractor. Plaintiff further claims that neither of these two employees was investigated and/or disciplined as a result of receiving items from the Mark 1 contractors. Despite these purported similarities, Amtrak argues that neither these employees nor the alleged circumstances are sufficiently similar to render them proper comparators. This Court agrees.

It is undisputed that Plaintiff and Mr. Bond held different positions and reported to different supervisors. As such, they are not similarly situated. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013) (holding that "an employee who holds a different job in a different department is not similarly situated"). In addition, Plaintiff and Mr. Bond did not engage in sufficiently similar conduct. When questioned by an investigator, Mr. Bond explained that he obtained the winter coat with the Amtrak logo while he was cleaning out a trailer ***after*** the 30th Street Façade Project had concluded. Plaintiff, on the other hand, undisputedly received and accepted approximately ***$1,300 in gifts*** from a Mark 1 contractor ***during*** the 30th Street Façade Project. Further, Plaintiff was not investigated or terminated because of his purported receipt of a winter coat with Amtrak logos; he was terminated because he received and accepted approximately $1,300 in other gifts, including the $900 furnace for his church. Based on these unrefuted facts, this Court finds that Plaintiff and Mr. Bond are not similarly situated.

While Plaintiff and Mr. Romano held the same position of Inspector, they did not engage in sufficiently similar conduct to be deemed similarly situated. When questioned by an

investigator, Mr. Romano explained that his Amtrak manager, Mr. Bhaskaran, gave him the Amtrak apparel. As noted, Plaintiff, on the other hand, undisputedly received and accepted approximately $1,300 in additional gifts *from Mark 1 during* the 30th Street Façade Project. Further, Plaintiff was neither investigated nor terminated because of his purported receipt of Amtrak apparel; he was terminated because he received and accepted approximately $1,300 in other gifts, including a $900 furnace for his church. Based on these unrefuted facts, this Court finds that Plaintiff and Mr. Romano are not similarly situated.

### b. Mr. Chinski and Mr. Ciferni

Plaintiff contends that Mr. Chinski and Mr. Ciferni were treated more favorably than him because—unlike Plaintiff—they were given multiple chances before they were disciplined and/or terminated. Like Mr. Bond, Mr. Chinski (a Track Supervisor) held a different position in a different department than Plaintiff and reported to a different supervisor. This alone renders Mr. Chinski an improper comparator. *See Mandel*, 76 F.3d at 170. Further, Mr. Chinski was disciplined for improperly logging time entries, conduct vastly different than that attributed to Plaintiff and underlying his termination. Based on these unrefuted facts, this Court finds that Plaintiff and Mr. Chinski are not similarly situated.

While Plaintiff and Mr. Ciferni at one time held the same position, they did not engage in sufficiently similar conduct to be deemed proper comparators. Mr. Ciferni was charged with unprofessional conduct, discrimination/harassment, and workplace violence, conduct that led to Mr. Ciferni's termination. Plaintiff was neither investigated nor terminated for conduct similar to that alleged against Mr. Ciferni; rather, he was terminated because he received and accepted approximately $1,300 in gifts. Under these unrefuted facts, this Court finds that Plaintiff and Mr. Ciferni are not similarly situated.

Having failed to present any proper comparator evidence, or any other evidence by which a reasonable factfinder could infer that Plaintiff's termination was for a discriminatory reason, Plaintiff has not met his summary judgment burden with respect to the fourth *prima facie* element of his disparate treatment claim. Accordingly, Defendant's motion for summary judgment is granted with respect to this claim.[4]

### 2. *Pretext*

Amtrak also argues that even if Plaintiff could make a *prima facie* showing of race discrimination, he has failed to raise a genuine dispute of material fact regarding Amtrak's proffered legitimate, non-discriminatory reasons for his termination. This Court agrees.

To show pretext, Plaintiff must provide evidence "from which a fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. To meet this burden, Plaintiff must "present evidence contradicting the core facts put forth by Defendant, the employer, as the legitimate reasons for its decision." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005). The plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765. Further, Plaintiff must present evidence that suggests that unlawful discrimination was more likely than not a motivating or determining factor in Amtrak's adverse employment action. *Id.* That is, Plaintiff

---

[4] Plaintiff's arguments are also belied by the undisputed evidence that a Caucasian employee was terminated as a result of the same investigation that led to Plaintiff's termination for violating the same policies. Specifically, Amtrak terminated Timothy Froehlig's employment after it was determined that Mr. Froehlig accepted gifts from Mark 1. The identical treatment of Plaintiff and Mr. Froehlig belies any inference of race discrimination with respect to Plaintiff's termination.

must do more than show that Amtrak's proffered reasons were wrong or mistaken; Plaintiff must demonstrate that Amtrak acted with discriminatory animus. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 283 (3d Cir. 2001). Plaintiff can meet this burden by pointing to evidence "that the employer has previously discriminated against [him], that the employer has discriminated against other persons within the plaintiff's protected class or within another class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson*, 142 F.3d at 645. Where a plaintiff presents evidence of similarly situated non-class members to sustain his burden at the pretext stage, he must show with some specificity that the comparators were more favorably treated. *Id.* at 646.

Here, Plaintiff relies on the same purported comparator evidence discussed above to show pretext. For the reasons discussed above, however, none of the employees is a proper comparator. As such, this evidence is insufficient to show pretext. *See Mandel*, 76 F.3d at 170.

Plaintiff also challenges Amtrak's reasons for termination by arguing that Amtrak relied on "new" 2021 company policies that were not in place at the time he accepted from Mr. McLaughlin the furnace for his church in 2016 and the suit and shoes in 2018. Plaintiff is mistaken. The policy in place in 2016 prohibited Amtrak employees from accepting gifts, including cash or services greater than $50 in value, or favors, from anyone affected by the employees' decisions. Similarly, the 2018 policy[5] prohibited Amtrak employees from accepting gifts, including cash or anything greater than $50 in value per occurrence or $200 in aggregate value, from any person or entity doing or seeking to do business with Amtrak. Plaintiff's conduct violated both versions of the policy when he accepted $1300 in gifts from Mark 1 representatives. As such, Plaintiff's argument premised on a purported "new" policy is without merit.

---

[5] Raymond Varelle, Vice President of Engineering Services, attested that the policy was updated in 2018. However, the policy attached to Mr. Varelle's declaration has an approval date of April 24, 2019.

12

### *Plaintiff's Retaliation Claim*

Plaintiff also asserts a claim for retaliation, premised on his allegation that Amtrak terminated his employment because of his complaints of discrimination.  Amtrak moves for summary judgment on this claim on the basis that Plaintiff has failed to establish the requisite causal connection between any protected activity (*i.e.*, complaints of discrimination) and his termination or that Amtrak's legitimate, non-discriminatory reasons for Plaintiff's termination were pretextual.

Like his race discrimination claim, Plaintiff's retaliation claim is subject to the *McDonnell Douglas* burden-shifting analysis. *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006).  As such, Plaintiff must first establish a *prima facie* case of retaliation by showing that:  (1) he engaged in activity protected by Title VII; (2) Amtrak took a materially adverse employment action against him; and (3) a causal connection exists between his participation in the protected activity and Amtrak's adverse action. *Wilkerson v. New Media Tech. Charter Sch., Inc.*, 522 F.3d 315, 320 (3d Cir. 2008).  To fall within Title VII's protection, the protected activity must relate to a discriminatory employment practice made unlawful by Title VII. *Curay-Cramer v. Ursuline Acad. of Wilmington, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006).

As noted, Title VII prohibits employment discrimination based on race, color, sex, religion, or national origin. 42 U.S.C. § 2000e-2.  "A general complaint of unfair treatment does not translate into a charge of illegal [] discrimination." *Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 485 (E.D. Pa. 2013) (quoting *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)).  To qualify as protected activity, the employee's complaint must identify the employer's unlawful practice by either explicitly or implicitly identifying the protected characteristic. *Barber*, 68 F.3d at 702.

A causal connection between the protected activity and adverse action may be inferred from: (1) an unusually suggestive temporal proximity between the complaints of discrimination and the employee's termination; (2) an intervening pattern of antagonism following the protected conduct; or (3) the proffered evidence examined as a whole. *Kachmar v. SunGuard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). The United States Court of Appeals for the Third Circuit has held that "[t]emporal proximity alone suffices only when it is 'unusually suggestive of retaliatory motive.'" *Simoni v. Diamond*, 835 F. App'x 660, 663 (3d Cir. 2020) (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)).[6]

In response to Amtrak's motion, Plaintiff asserts that:

> From 2010-2019 I had complained of racism/harassment and retaliation. I had written 7 letters, made several calls to employees hot lines in Amtrak and outside of Amtrak. I even wrote a letter (at the time) [to] Vice-President Biden, regarding being harassed and discriminated against.
>
> ***
>
> In 2018 I contacted EECO complaining of discrimination by Amtrak Manager Mark Slimbok and in 2019, I call Amtrak's ethics hot[line] to report being harassed by Amtrak Manager, Barry Bond.

(Pl.'s Resp., ECF 54, at pp. 2–3). As evidentiary support, Plaintiff cites *solely* to Exhibit A1. This exhibit appears to document three separate Ethics Hotline complaints that Plaintiff made on or about August 16, 2012, October 28, 2014, and September 23, 2020. Notably, Plaintiff provides

---

[6] Once Plaintiff establishes a *prima facie* case, the burden shifts to Amtrak to advance a legitimate, non-retaliatory reason for its action. *Krouse*, 126 F.3d at 500; *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997). Once Amtrak meets this burden, the burden shifts back to Plaintiff to show pretext by providing evidence that a factfinder could reasonably (1) disbelieve Amtrak's proffered legitimate reasons or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Amtrak's action. *Fuentes*, 32 F.3d at 764. Again, this burden-shifting process requires Plaintiff to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 765.

14

no evidence of any of the other alleged complaints referenced in his response to Amtrak's motion. Regardless, none of these complaints evidences a complaint of discrimination made unlawful by Title VII as required to establish a *prima facie* claim of retaliation. *Curay-Cramer*, 450 F.3d at 135. These three referenced complaints are summarized as follows:

- **April 16, 2012 complaint:** Plaintiff complains that less qualified employees were hired for positions that Plaintiff sought. However, Plaintiff makes no reference to discrimination made unlawful by Title VII.
- **October 28, 2014 complaint:** Plaintiff complains of multiple instances of workplace "harassment" by co-workers. However, Plaintiff asserts no connection between the alleged harassment and discrimination made unlawful by Title VII.
- **September 23, 2020 complaint:** Plaintiff complains about a supervisor assigning him a task that fell outside of Plaintiff's job duties. However, Plaintiff asserts no connection between the alleged assignment and discrimination made unlawful by Title VII.

At best, each of these complaints amounts to a general complaint of unfair treatment. They do not, however, identify any practice made unlawful by Title VII by either explicitly or implicitly identifying a protected characteristic. *Barber*, 68 F.3d at 702. As such, Plaintiff has not met his summary judgment burden of showing the requisite activity protected by Title VII.

Notwithstanding, Plaintiff has also failed to present any evidence from which a reasonable factfinder could infer a causal connection between a protected activity and his termination. As to temporal proximity, each of the three cited complaints is too remote in time to establish the requisite causal link between the complaints and Plaintiff's termination in March 2021. *See LeBoon v. Lancaster J.C.C. Ass'n.*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."); *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007)

(finding a five-month gap between protected activity and adverse action insufficient by itself to support inference of causation). Further, Plaintiff has not presented any evidence of an intervening pattern of antagonism following the three cited complaints or any other evidence, examined as a whole, that could demonstrate the requisite causal link. *Kachmar*, 109 F.3d at 177. As such, Plaintiff has failed to meet his summary judgment burden as to causation. Accordingly, Amtrak's motion for summary judgment as to Plaintiff's retaliation claim is granted.[7]

**CONCLUSION**

For the foregoing reasons, this Court finds that Plaintiff has failed to meet his summary judgment burden with respect to any of his claims. Accordingly, Amtrak's motion for summary judgment is granted. An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, J.

---

[7] Amtrak also argues that Plaintiff's retaliation claim fails because he has not presented evidence to show that Amtrak's proffered non-discriminatory reasons for his termination were pretext for discrimination. For the reasons set forth above in this Court's discussion of Plaintiff's disparate treatment claim, this Court agrees with Amtrak.